IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

ROBERT W. GREEN,                    )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )          7:15-cv-01854-LSC
                                    )
CITY OF NORTHPORT, et               )
al.,                                )
                                    )
        Defendants.                 )

## MEMORANDUM OF OPINION

Before the Court is Defendants', City of Northport ("City") and Scott
Collins ("Collins") (collectively "Defendants"), Motion for Summary Judgment.
(Doc. 42.) Likewise before the Court are Defendants' Motion to Admit Evidence
(doc. 40), Motion for the Court to Take Judicial Notice (doc. 41), Motion to Strike
Exhibit K (doc. 60), and Plaintiff Robert W. Green's ("Plaintiff") Motion to Strike
(doc. 52). This case caps what has been a lengthy dispute between Plaintiff and
Defendants concerning Plaintiff's former employment as Chief of Police of the City
of Northport. Following allegations of racial discrimination by Plaintiff against
Defendants and exhaustion of administrative remedies, Plaintiff instituted suit in
the Northern District of Alabama in the case styled *Green v. City of Northport*
("*Green I*"), 7:11-cv-2354-SLB, 2014 WL 1338108 (N.D. Ala. Mar. 31, 2014). This

action is related to, and arises from issues addressed in *Green I*. Specifically, Plaintiff claims that Defendants retaliated against him for filing his EEOC charges and later instituting *Green I*; Defendants later escalated such retaliation, created a hostile work environment, and constructively discharged Plaintiff in 2012.

Defendants deny that any of their actions were done in retaliation for Plaintiff's litigation activities in *Green I*. They instead point to a slew of complaints by various city officials and employees about Plaintiff's management style and the atmosphere he created in the City Police Department. Defendants state that they determined it was necessary for the safety of city officials and employees to audit the City Police Department and place Plaintiff on paid administrative leave. After receiving the results of the audit, which were negative towards Plaintiff, Defendants determined that Plaintiff should be allowed to resign, or alternatively terminated from his position. Following a meeting between the parties on May 29, 2012, Plaintiff resigned his position and then filed the administrative charges with the EEOC that eventually led to this suit. As set out in further detail below, Defendants' Motion for Summary Judgment is due to be granted.

## I. BACKGROUND

### a. RELEVANT FACTS LEADING TO *GREEN I*

Plaintiff first became employed as Police Chief for the City of Northport on April 17, 2006. When Plaintiff was first hired, Charles Swann ("Swann") was the City Administrator. Collins was a member of the Northport City Council when Plaintiff was hired. Collins voted to hire Plaintiff as Police Chief because he believed Plaintiff was the most qualified candidate for the job. (Doc. 46 Ex. B Collins Depo. at 135.) While Plaintiff was Police Chief and Swann was the City Administrator, Plaintiff did not receive any criticism regarding his job performance. (Doc. 44 Ex. A Green Depo. at 276-77.) Likewise, throughout his tenure as Mayor of the City of Northport starting in November 2008, Bobby Herndon ("Herndon") never learned of any problems the City had with Plaintiff. (Doc. 51 Ex. B Herndon Depo. at 17, 20.)

At the end of 2008, Swann became the City Engineer, and on December 15, 2008, Scott Collins became employed as City Administrator. (Doc. 46 Ex. B Collins Depo. at 136.) As City Administrator, Collins was responsible for nine departments within the City: police, fire, IT, public works, utilities, HR, planning, legal, and retail development. As part of his duties, Collins worked closely with Plaintiff. At all times relevant to the instant lawsuit, Plaintiff reported to Collins. Collins had authority to discipline all city employees, including department heads;

however, Collins needed approval from the City Council to terminate a department head.

Plaintiff filed an EEOC charge against the City of Northport on May 14, 2009 and later filed an Amended EEOC charge against the City on June 2, 2009. Plaintiff continued to do his job as Police Chief; however, he testified that he felt he was being subjected to hostile working conditions because of Collins's discrimination and retaliation. For example, on December 16, 2009, Collins stormed into Plaintiff's office, slammed the door behind him, and screamed at Plaintiff. On December 21, 2009, Plaintiff sent a letter to the City Council which outlined Collins's violation of the anti-harassment policy and his alleged unprofessional conduct based on that incident. Collins was not disciplined for that incident.

After investigating Plaintiff's two charges, the EEOC issued a dismissal and Notice of Right to Sue on April 1, 2011. On June 29, 2011, Plaintiff filed a Complaint in the United States District Court for the Northern District of Alabama alleging race discrimination and retaliation against the City of Northport and Collins, *Green I*. Plaintiff remained Police Chief until his voluntary resignation on May 31, 2012.

While Plaintiff testified that he and Collins had a "strained and rocky relationship," Plaintiff admitted that he and Collins routinely spoke, met, discussed department needs and purchases, and deferred to one another in the time period from 2011-2012. One example of such deference occurred in an October 21, 2011 e-mail exchange with the City Council and Plaintiff. In that e-mail, Collins indicated that a pumper truck, requested by the Fire Department, was too expensive and recommended getting a less expensive ladder truck. In the same e-mail, Collins asked Plaintiff for his input concerning the number of police vehicles the department needed. Plaintiff testified that he believed he got all the police vehicles he requested in 2011, although Collins ordered vehicles that were different from the ones Plaintiff and the police department preferred.

### b. DEFENDANTS ORDER EXTERNAL AUDIT OF THE POLICE DEPARTMENT

Collins testified that "a number of incidents in the Police Department" led him to believe that the City needed an external audit of the Police Department by an independent expert. (Doc. 51 Ex. A at Ex. 213-14). He specifically referred to the following:

On June 24, 2011, Plaintiff requested copies of psychological reports for all department employees. (Doc. 44 Ex. A Green Depo. at 106.) In his e-mail to the Northport City Council President, Plaintiff stated that he had "an officer who is

about to go off the deep end" and that "[t]he officer in question is capable of showing up at a City Council meeting and shooting up the council chambers." (*Id.*) Plaintiff also explained in the e-mail that he had access to officers' psychological reports for many years, but that Collins had stopped providing him with the reports. Collins testified that the threat of an officer shooting up City Hall concerned him and that Plaintiff's statement was "alarming." Collins attempted to discuss the matter with Plaintiff verbally and further attempted to schedule two meetings with Plaintiff, but never received a response. Collins did not document these attempts, nor did he discipline Plaintiff for not meeting with him. (Doc. 46 Ex. B Collins Depo. at 243-44.) Collins later sent Plaintiff a follow-up e-mail three months later requesting to meet regarding the office safety issue.

On November 1, 2011, Collins received a complaint from IT Director Michael Ramm ("Ramm"), another department head, that Plaintiff had been threatening and disrespectful towards him in an e-mail exchange. Ramm and Plaintiff had corresponded regarding the location of new computers for the police department, and they did not agree on where the computers would be placed. Plaintiff sent Ramm an e-mail on November 1, 2011 insisting that Ramm follow Plaintiff's plan for the computers, telling Ramm that he (Plaintiff) "was trying to be civil about this matter" and warning Ramm "don't make waves." Collins

testified that Ramm was offended by Plaintiff's e-mail. After receiving Ramm's complaint, Collins forwarded the information to Rodger Fisher, then-Human Resources Director. On November 9, 2011, after Fisher responded to Collins, Collins issued a written warning to Plaintiff concerning the November 1, 2011 e-mail. In the warning, Collins instructed Plaintiff that he was to be professional and respectful to all city employees, including in instances of disagreement. Plaintiff refused to sign the warning, but was not penalized in any way for his refusal to sign it.

Plaintiff also recalled an incident in which a female police officer, Carrie Summers ("Summers"), accused Lt. Jason McKinney ("McKinney") of sexual harassment. Plaintiff testified that he did not remember the details of Summers's complaint. Plaintiff did not recall whether McKinney was placed on paid administrative leave while the City investigated the allegations. However, Plaintiff admitted that placing an individual on leave so an investigation could be conducted is a legitimate practice. (Doc. 44 Ex. A Green Depo. at 139-40). During the investigation into Summers's complaint about McKinney, the Northport Incident Investigation Team ("I.I. Team") interviewed another female police officer, Kelly McCarley, on December 5, 2011. In the interview, McCarley complained about the lack of morale in the police department, the high turnover rate, the lack of

confidentiality, and how when they take complaints to a supervisor or to Plaintiff, nothing ever gets done. (Doc. 46 Ex. B Collins Depo. at 213-18.) Collins received a report from the group that was compiled to investigate McCarley's complaint and was also told that McCarley felt safer in a dangerous area of Northport unarmed than at the Police Department. (*Id.* at 215.)

On or about December 5, 2011, in a meeting with the I.I. Team, legal, and various City Council members, Collins verbalized the idea of bringing in independent auditors to "tell us what we need to do or don't need to do." (Doc. 46 Ex. B Collins Depo. at 476.) Collins also stated in his deposition that "[t]here were some things that we needed to address and I felt it was best to have someone from the outside to take a look and tell us are we operating right, are we not operating right." Collins first called Chief Cooley at the police academy for a recommendation for a person to conduct the audit. Collins testified that Cooley gave him the name Robert Pastula ("Pastula") at the University of North Alabama. Collins sent an e-mail to Pastula on December 8, 2011, explaining that the City is "looking into some operational issues within our police department and are considering requesting for an outside independent consultant or consulting firm to conduct a management study and review of the department."

On December 13, 2011, five days after he contacted Pastula, Collins received a written complaint from Captain Tim Frazier ("Frazier") in which he alleged Plaintiff harassed and treated him unfairly. Frazier wrote in the complaint that in a December 12, 2011 meeting with Plaintiff, Plaintiff called Frazier a "hostile captain and a mad captain." Further, Plaintiff refused to give Frazier the schedule to which he was entitled according to his shift preference. Frazier wrote that he told Plaintiff he felt he was being singled out by Plaintiff. Frazier later filed an EEOC charge against Plaintiff, stating "I believe Chief Green [Plaintiff] created a hostile work environment." (Doc. 44 Ex. A. Ex. 26.)

Collins thereafter recommended the audit to the Northport City Council, and the City Council unanimously approved it.[1] (Doc. 46 Ex. B Collins Depo. at 247.) Collins testified that he thought Plaintiff's presence in the department might influence the study, so he placed Plaintiff on paid administrative leave. (*Id.* at 249.) The City Council agreed. (*Id.* at 248.) Collins testified that he offered to also go on leave for the duration of the audit, but the City Council declined to place Collins on leave, saying it was not necessary. (*Id.* at 247-48.)

On February 20, 2012, Collins met with Plaintiff and informed Plaintiff he was being placed on leave. (*See* Doc. 45 Ex. B Ex. 27.) Plaintiff testified that Collins

---

[1] Collins had to obtain City Council approval for any funding over $15,000. At the time of this action, the City Council included five members, two of which were minorities. (Doc. 44 Ex. A Green Depo. at 66-67.)

told him in the meeting that he had done nothing wrong. (Doc. 44 Ex. A Green Depo. at 316.) Plaintiff testified that he had been fearful of retaliation by Collins, and that the audit of the Police Department was a complete shock. (*Id.* at 393.) At the end of the meeting, Collins took Plaintiff's city-owned firearm, keys, and cards. Collins testified that he similarly took a white department head's city-owned keys and cards when that department head was placed on leave. (Doc. 46 Ex. B Collins Depo. at 228-29.)

Plaintiff was embarrassed when he was put on paid leave, but admitted that the purpose of placing an employee on paid administrative leave is to enable the City to fairly investigate a matter. (*Id.* at 191.) Plaintiff also admitted that he considered this practice legitimate protocol and "standard procedure." (*Id.* at 139-40, 190.) Plaintiff also admitted that during his tenure as police chief, he had placed at least one employee on paid administrative leave to investigate accusations against that employee. (*Id.* at 186-191.)

Also on February 21, 2012, Collins met with the Police Department staff. Collins testified that "[t]here was a lot going on in the police department," and his purpose in speaking to the staff was "to make sure that everyone understood the status of the police department, come to work, do your job, there's going to be a study that takes place, be honest, tell the truth, make it effective, don't leave

anything on the table, follow through what you're supposed to do to make your department better whatever that is." (Doc. 46 Ex. B Collins Depo. at 253-254.) Collins informed the employees at the meeting that he had placed Plaintiff on administrative leave. (*Id.* at 254.) Further, Collins testified that he discussed Plaintiff's EEOC charges in the meeting, including incidents regarding a BMW and an incident with an officer named Crowder; however, Collins stated that he believed the mentioning of the BMW incident and other complaints from the department was in response to a specific question asked by members of the Police Department during the meeting. (*Id.* at 261-63.) Collins further testified that he stated in the meeting that Plaintiff had filed his lawsuit in *Green I* eighty-eight days after receiving his Notice of Right to Sue from the EEOC. (*Id.* at 291.) Collins denied that he was trying to influence the audit/study, other than having staff "tell the truth and do what they need to do." (*Id.* at 254.)

In March 2012, the City Council chose CWH Research of Lone Tree, Colorado to conduct the audit of the Police Department. (Doc. 45 Ex. A at Ex. 35; Doc. 46 Ex. B Collins Depo. at 475.) Regarding the cost of the audit, Collins testified that $46,000 "sounded about right." (*Id.*) Collins testified that 2010 and 2011 were the worst times for city budgeting and there was not money for pens,

pencils, and garbage pickup; however, Collins further testified that the budget had improved by the time the audit was to be conducted. (*Id.* at 447-48, 475.)

On Monday, April 23, 2012, the audit began with Collins being interviewed. (*Id.* at 472.) The auditors reviewed, among many other items, the "Complaint and Case of Robert Green vs. City of Northport and Scott Collins", aka *Green I*. (Doc. 51 Ex. A at Ex. 27 at 8.) Plaintiff testified that he met with the auditors for only ten to twelve minutes, (Doc. 44 Ex. A Green Depo. at 416), although the audit agenda reflects that the auditors set aside three hours to meet with Plaintiff. (Doc. 51 Ex. A at Ex. 27 at 72.) Auditors interviewed fifty-six Police Department employees as part of the audit. Not all employees were interviewed. According to the audit report, the auditors conducted on-site visits from April 23 through April 26, 2012; May 15, 2012; and May 18, 2012. (*Id.* at 8.) Further, CWH Research e-mailed survey invitations to all sworn officers, desk officers, and dispatchers on May 14, 2012. (*Id.* at 8-9.) According to the audit report, sixty-two responses were returned as of May 28, 2012. (*Id.* at 9.)

### c. THE PARTIES HOLD A "MEDIATION" CONFERENCE

On May 29, 2012, the parties in *Green I* conducted an informal mediation conference. In the meeting, the City offered to settle all pending claims by Plaintiff, which consisted of Plaintiff dismissing *Green I*, resigning his position, and accepting

a financial settlement of $43,000. Plaintiff testified that Collins also represented that the City would not release the audit results in exchange for Plaintiff's retirement and the settlement of *Green I*.[2] (*Id.* at 52-53.) Collins on the other hand testified that the City did not have the option to keep the study private because it was a publicly funded audit. (Doc. 46 Ex. B Collins Depo. at 429-30.) Plaintiff also testified that Collins said the study was negative for Plaintiff, and if Plaintiff did not dismiss *Green I* and retire by May 31, 2012, the City would release the results of the audit. (Doc. 44 Ex. A Green Depo. at 212-13.) According to Plaintiff, Collins told him that if he did not retire, he would be fired at the next City Council meeting on June 4, 2012. (*Id.* at 212-13, 225-26.) Plaintiff also testified that in additions to the results of the study, Collins identified other issues in the Police Department, including a sexual harassment complaint, although it was not directed at Plaintiff, and a complaint regarding manipulation of payroll. (*Id.* at 213.) Plaintiff testified that Courtney Crowder, an attorney representing the Defendants, told him that "sometimes the team wants to change the coaches." (*Id.* at 214.)

On May 31, 2012, Plaintiff submitted his resignation via e-mail to Collins, copying his attorneys. Plaintiff admitted in his deposition that he knew he could have waited to see what would happen or what action the City Council might take.

---

[2] Collins disputes that he asked Plaintiff to retire and that he had authority to do so.

(*Id.* at 225-29.) Plaintiff also knew he could have appealed to the Northport Civil Service Board ("CSB") if he were terminated. (*Id.* at 230.) Plaintiff chose to make his resignation to be effective July 1, 2012, meaning that Plaintiff gave over one month's notice of his retirement; however, Plaintiff testified that he was required to give thirty days' notice to the Retirement System of Alabama to receive retirement benefits. (Doc. 45 Ex. A Green Depo. at Ex. 34.)

After his resignation Plaintiff filed two EEOC charges against the City of Northport. Then on July 18, 2012, seventeen days after his resignation was effective, Plaintiff filed EEOC charge No. 420-2012-02762. (Doc. 45 Ex. A Green Depo. at Ex. 7.) On August 17, 2012, Plaintiff filed an Amended EEOC charge. (*Id.* at Ex. 8.) *Green I* was dismissed on March 31, 2014, and Plaintiff filed the complaint in the instant case on October 22, 2015.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

A motion for summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013). A genuine dispute as to a material fact

exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues to be resolved at trial. *Anderson,* 447 U.S. at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). "[T]he moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the

nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## III.   DISCUSSION

### a.   RACIAL DISCRIMINATION

In his response to Defendants' Motion for Summary Judgment, Plaintiff has clarified that "[a]fter review of the record, [Plaintiff] concedes his claim of race discrimination." (Doc. 53 at 4.) Because Plaintiff has not opposed Defendants' Motion in this respect, Plaintiff's claim for "Title VII and § 1981 Racial Discrimination," (doc. 1 at 5), is due to be dismissed.

### b.   HOSTILE WORK ENVIRONMENT

Defendants have also moved for dismissal of Plaintiff's hostile work environment claim, (doc. 42 at 62), and Plaintiff has in no way addressed the merits of Defendants' arguments in his Response. The Court deems this claim abandoned, and will also be dismissed. *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not

relied upon in summary judgment are deemed abandoned" (quoting *Lyes v. City of Riviera Beach*, 126 F.3d 1380, 1388 (11th Cir. 1997))).

### c. CONSTRUCTIVE DISCHARGE

Plaintiff argues that following the audit, Collins and his counsel "summoned [Plaintiff] to a meeting which he alleged was a 'mediation conference,' despite not having a mediator present and threatened and tried to manipulate Green into dismissing his lawsuit and leaving his employment." (Doc. 53 at 40.)Plaintiff argues that the statements made during that settlement conference amount to his constructive discharge. Before addressing the merits of Plaintiff's claim the Court must first address Defendants' challenge to the admissibility of the statements made during this meeting under Federal Rule of Evidence 408.

Defendants argue that the discussions between the parties at the May 29, 2012 conference are inadmissible settlement negotiations according to Federal Rule of Evidence 408. Plaintiff responds that Rule 408 does not prevent negotiations regarding one lawsuit from being admissible in a different, future lawsuit; therefore, because the parties' discussions pertained only to the first lawsuit *Green I*, what was said during the May 29, 2012 discussions is admissible in the present lawsuit.

Negotiations seeking to settle one lawsuit may be admissible in a future lawsuit concerning different claims. Such a reading of Rule 408 is consistent with

the rule's text, which reads: "Evidence of the following is not admissible … either to prove or disprove the validity or amount of *a disputed claim* …: furnishing, promising, or offering … a valuable consideration in compromising or attempting to compromise *the claim*." Fed. R. Evid. 408 (emphasis added). While the Court's research has found no binding authority directly on point, the Court is persuaded that evidence of settlement negotiations may be admissible in a case when those negotiations relate to a different case. *See Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 689 (7th Cir. 2005); *Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992); *Armstrong v. HRB Royalty, Inc.*, 392 F. Supp. 2d 1302, 1304 (S.D. Ala. 2005) ("Gauged either by standard usage of the English language or by accepted rules of statutory construction, the definite article 'the' limits 'the claim' [under Rule 408] as to which evidence may not be admitted to the claim previously referenced, i.e., the claim which was the subject of a settlement offer.").

Defendants argue in their Reply that the purpose of the mediation conference was to reach a global settlement of all present and future claims between the parties. (Doc. 62 at 29.) However, this argument is not supported by any evidence in the record; in fact, it is contradicted by both Collins's and Plaintiff's sworn deposition testimony that the aim of conference was to settle

*Green I.*[3] (Doc. 44 Ex. A Green Depo. at 212 ("Collins said that he offered a settlement somewhere around 43 thousand dollars. And he said that the results of the study were negative, but if I were to drop my complaint . . . ."); Doc. 46 Ex. B Collins Depo. at 6–10 ("Q: Wasn't a term of condition of the settlement is that he dismiss his [current] lawsuit? A: Yes, sir.") Given that the statements made in the "mediation conference" themselves serve as the basis for Plaintiff's constructive discharge and retaliation claim, it is nonsensical to say that the Defendants' statements were a threat to retaliate against Plaintiff and also an offer to settle that retaliation and constructive discharge claim. Defendants have failed to show how the statements made during that "conference" are inadmissible for purposes of the present motion.

Plaintiff appears to assert two separate claims related to the May 29, 2012, mediation conference as underlying both his constructive discharge claim, and to serve as a "materially adverse action" for his claim of retaliation. To prove constructive discharge, the plaintiff must demonstrate that his "working conditions were *so intolerable* that a reasonable person in [his] position would be compelled to resign." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (emphasis added). In the Eleventh Circuit, employee resignations are presumed

---

[3] The Court also notes the Defendant's assertion in his Statement of Undisputed Facts that the City made an offer "to settle all *pending* claims." (Doc. 42 ¶ 75.)

voluntary, even if the only alternative to resignation is facing termination for cause. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995). Even when the plaintiff faces an unpleasant alternative, e.g., termination for cause, the resignation is nevertheless presumed voluntary because "the fact remains that plaintiff *had a choice*. He could stand pat and fight." *Id.* (internal citations omitted) (emphasis in the original). The Court judges the availability of real alternatives under an objective standard, rather than by the employee's subjective evaluation. *Id.* Factors for the Court to consider include:

> (1) whether the employee was given some alternative to resignation;
>
> (2) whether the employee understood the nature of the choice he was given;
>
> (3) whether the employee was given a reasonable time in which to choose;
>
> (4) whether the employee was permitted to select the effective date of the resignation; and
>
> (5) whether the employee had the advice of counsel.

*Hargray*, 57 F.3d at 1568.

Even construing the facts in the light most favorable to Plaintiff, including that Collins did in fact offer not to release the audit results in exchange for Plaintiff's resignation, Plaintiff has not rebutted the presumption that his resignation was voluntary. Plaintiff was faced with a choice to (1) resign voluntarily

and collect retirement benefits or (2) to wait and see what action the City Council would take at the next meeting. Plaintiff himself acknowledged that he had such a choice and could appeal any negative action to the Northport Civil Service Board. (Doc. 44 Ex. A Green Depo. at 225-29, 30.) Plaintiff also understood the nature of his choice: retire by May 31, 2012 and avoid the release of the negative audit results, or he could be fired at the next City Council meeting on June 4, 2012 and the audit results would be released. (*Id.* at 212-15.) Further, Plaintiff was permitted to select the effective date of his resignation as July 1, 2012—more than thirty days after the parties' mediation conference—so that he could collect his retirement benefits. (*Id.* at 232.) Plaintiff was likewise represented by counsel during the negotiations. Based on the totality of these factors, the Court concludes that Plaintiff has not rebutted the presumption that his resignation was voluntary.

No reasonable person in Plaintiff's position would find Plaintiff's working conditions—the audit, being placed on paid administrative leave, Collins's offer to not release the audit if Plaintiff dismissed *Green I*, or being given a choice between resignation and termination—so intolerable that they felt compelled to resign. Therefore, Plaintiff has failed to prove constructive discharge and this claim is due to be dismissed.

### d. RETALIATION

Title VII prohibits an employer from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" pursuant to a charge of unlawful discrimination." 42 U.S.C. 2000e–3(a). Absent direct evidence of retaliation, the plaintiff may demonstrate circumstantial evidence of retaliation through the *McDonnell Douglas* burden-shifting framework. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the aggrieved employee must first make out a *prima facie* case of retaliation. *Brown*, 597 F.3d at 1181. The burden of production then shifts to the defendant-employer "to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (quoting *Bryant*, 575 F.3d at 1308). After the employer offers a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff employee must prove his case through additional evidence demonstrating that the employer's reason is a pretext for unlawful retaliation. *Id.* at 1181–82 (quoting *Bryant*, 575 F.3d at 1308). Throughout the entire process, the ultimate burden of persuading the trier of fact that the defendant engaged in unlawful retaliation remains with the Plaintiff. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)

### i. *PRIMA FACIE* CASE

To establish a *prima facie* case for retaliation under § 1981 or Title VII, a plaintiff must show that (1) he was engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016); *see also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes [i.e., section 1981 and Title VII] have the same requirements of proof and use the same analytical framework."). A complaint that "explicitly or implicitly communicate[s] a belief that [the conduct suffered by the plaintiff] constitutes unlawful employment discrimination" is protected activity. *Furcron*, 161 F.3d at 1311. Similarly, an adverse employment action need not be as serious as outright termination but may also include "adverse actions which fall short of ultimate employment decisions," such as written reprimands. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th Cir. 1998). To prove causation, the plaintiff must demonstrate that the employer's desire to retaliate was the but-for cause of the alleged adverse employment action. *Booth v. Pasco Cty.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 363 (2013)).

### 1. STATUTORILY PROTECTED ACTIVITY

Plaintiff asserts that he engaged in statutorily protected activity when he (1) filed an EEOC charge on May 14, 2009 and an amended charge on June 2, 2009, (2) filed his Complaint in *Green I* on June 29, 2011, and prosecuted that case, and (3) sent a letter to the Northport City Council on December 21, 2009. (Doc. 53 at 35). Defendants concede that the filing of the original and amended EEOC charges constitutes statutorily protected activity, but dispute that the filing of the Complaint based on the same EEOC charges constitutes a separate "statutorily protected activity" from the filing of the EEOC charge, and also dispute that the December 21, 2009, letter constitutes protected activity. (Doc. 62 at 30.)

Statutorily protected activity includes (1) "oppos[ing] any practice made an unlawful employment practice by" Title VII and (2) "mak[ing] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a); see *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174–75 (11th Cir. 2000). The filing of a lawsuit under Title VII against an employer is a "statutorily protected activity." While the Defendants dispute under the causation prong of the analysis whether the Court may consider the filing of *Green I* as an occurrence separate and apart from the initial EEOC complaints that were conditions precedent to filing the suit, there can be no dispute that the filing of the suit itself was a "statutorily protected

activity." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (considering petitioner's filing of suit against respondent as a statutorily protected activity, but rejecting a causal link between filing of suit and adverse action because suit was filed after respondent determined to take adverse action); *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) (The plaintiff's participation in FLSA lawsuit was protected activity, but not causally linked to any materially adverse action.).

Finally, Green identifies his December 21, 2009, letter to the Northport City Council as statutorily protected activity. *Green I* already considered this letter and correctly noted that "[the December 21, 2009 letter] does not mention that [Plaintiff] considered the hostile environment to be based on his race or retaliation for complaining about race discrimination. Rather, he contends that Collins berated him on this occasion because he had stated that he was going to contact the United States Department of Labor regarding issues with his work hours." *Green I*, 2014 WL 1338108, at *13 (internal citation omitted). Title VII's protections only extend to individuals who communicate, explicitly or implicitly, their belief that their employer's actions constitute unlawful employment discrimination. *Furcron*, 843 F.3d at 1310; *see also EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (August 25, 2016), https://www.eeoc.gov/laws/guidance/retaliation-

guidance.cfm. The letter makes clear that Plaintiff is communicating his belief that Collins's actions violated the *Northport Anti-Harassment Policy*, not employment discrimination law. Even construing the letter liberally,[4] a reasonable jury could not conclude that Plaintiff even implicitly communicated a belief that Collins's actions constituted unlawful employment discrimination. Therefore, the December 21, 2009, letter from Plaintiff to the Northport City Council is not statutorily protected activity for the purposes of Plaintiff's *prima facie* case for retaliation.[5]

## 2. Adverse Employment Actions

To prove an adverse employment action in the context of a retaliation claim, the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *accord Crawford*

---

[4] The EEOC Guidance on Retaliation encourages a broad reading of the protected activity requirement, given that many individuals "may not know the specific requirements of anti-discrimination laws." *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (August 25, 2016), https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm. The communication is protected if it "would reasonably have been interpreted as opposition to employment discrimination." *Id.*

[5] Defendants appear to argue that the "law of the case" doctrine applies to this issue in light of Judge Blackburn's holding in *Green I*. (Doc. 42 at 47.) This argument is without merit. Judge Blackburn did not hold in *Green I* that the letter was not statutorily protected activity. Rather, Judge Blackburn merely observed (correctly) that the letter failed to allege that any of the actions by Collins were based on Plaintiff's race or retaliation. *Green v. City of Northport et al.*, No. 7:11-CV–2354–SLB, 2014 WL 1338108 at *13 (N.D. Ala. Mar. 31, 2014), *aff'd* 599 Fed. App'x 894 (11th Cir. 2015).

*v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008). Plaintiff alleges that the following constitute adverse employment actions by Collins: (1) the police department being subjected to an audit; (2) Plaintiff's placement on administrative leave; and (3) Plaintiff's constructive discharge during the "mediation conference." (Doc. 53 at 36.)

## A. AUDIT

Plaintiff argues that the ordering of a departmental audit was an adverse employment action that would dissuade a reasonable employee from pursuing a claim of discrimination or retaliation. (Doc. 53 at 38) Plaintiff states that:

> Collins went after Plaintiff, and made it difficult for Plaintiff to manage his department. According to Janis Green, a neutral witness, Collins micromanaged the department, and held requisition orders which made it difficult to order uniforms and supplies. After meddling in the Police Department and undermining Plaintiff's credibility he blamed any issues in the department on Plaintiff.
>
> . . .
>
> Collins testified there was not money in the budget for pencils, lightbulbs or garbage pickup, yet he recommended to the City Council to spend $46,000 on an audit.

(*Id.* at 38-39) Plaintiff does not explain in any of his briefs why a departmental audit is materially adverse, aside from questioning the reasonableness of the decision and making a circular argument that the action was adverse because it was done in retaliation for Plaintiff's EEOC charge. Plaintiff's allegations and evidence of

Collins' meddling and micromanagement do not inform the materially adverse employment action inquiry, but simply seeks to quarrel with the wisdom of those actions. In reviewing the evidence and considering it in the light most favorable to Plaintiff, the Court concludes that a reasonable employee under the circumstances would not be dissuaded from maintaining a discrimination claim by a departmental audit.

## B. PAID ADMINISTRATIVE LEAVE

Plaintiff argues that being placed on paid administrative leave was an adverse employment action that would dissuade a reasonable employee from pursuing a claim of discrimination or retaliation against Collins. (Doc. 53 at 39.) However, Plaintiff does not explain in any of his pleadings why being placed on leave is materially adverse. Like his audit argument, Plaintiff simply questions the reasonableness of the decision and makes a circular argument that the action was adverse because it was done in retaliation for Plaintiff's EEOC charge.

Being placed in paid administrative leave would not dissuade a reasonable worker from pursuing a discrimination claim against his employer. While a loss or reduction in pay would constitute an adverse employment action, Plaintiff did not suffer any such loss or reduction as a result of his leave. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir. 2001). Similarly, having to surrender his

gun, badge, and keys is not materially adverse; it would not discourage a reasonable employee from sustaining a charge of discrimination. Further, even if a reasonable worker would be embarrassed by being placed on paid administrative leave, it does not follow that said reasonable worker would be dissuaded from pursuing a charge of discrimination as a result. And the Eleventh Circuit has observed that Title VII's protections "simply do not extend to everything that makes an employee unhappy." *Davis*, 245 F.3d at 1242 (internal quotations and citation omitted).

More importantly, it was legitimate protocol and standard procedure within the Northport Police Department to place an employee on leave to allow the City to fairly investigate a matter, which Plaintiff himself admitted. (Doc. 44 Ex. A Green Depo. at 139–40; 190–91.) To underscore the alleged impropriety of placing Plaintiff on leave, Plaintiff highlights that Collins himself continued to serve as City Administrator for the duration of the audit. (Doc. 53 at 39.) However, Collins testified that he offered to go on leave during the audit, but the City Council declined to place him on leave. (Doc. 46 Ex. B Collins Depo. at 247–48.)

Given that Plaintiff was placed on *paid* leave and given that placing an individual on leave was the Department's standard procedure in similar circumstances, a reasonable jury could not conclude that placing Plaintiff on administrative leave constitutes an adverse employment action. That Plaintiff was

allegedly constructively discharged when he was on paid leave does not change the fact that the paid leave was not materially adverse. Plaintiff's claim concerning administrative leave must stand on its own, and it is not somehow transformed into a materially adverse action by acts the Defendants took later during the mediation conference.

### C. STATEMENTS DURING SETTLEMENT CONFERENCE

Plaintiff additionally argues that Defendants threatened and tried to manipulate Plaintiff into dismissing his lawsuit and leaving his employment at what has been described as a mediation conference. (Doc. 53 at 40.) While there is a dispute over what exactly Collins said during the mediation conference, even assuming the truth of Plaintiff's version of events, Plaintiff's claim that he suffered a materially adverse action through Defendants' statements during this meeting is without merit.

Defendants deny that Collins ever said that the City would not release the results of the audit if Plaintiff dismissed his lawsuit. They contend that "the City was not able to keep the audit study private because it was a publically funded audit." (Doc. 42 ¶ 80; *see also* Doc. 42 Ex. B Collins Depo. at 10 ("Q: And if [Plaintiff] didn't retire you were going to release the study, the audit had been conducted that reflected negative on him; is that correct? A: That is not correct. Q:

So you didn't say that? A: No, sir, I did not."). On the other hand, Plaintiff, referring to what he had written in one of his EEOC charges, recounted that during the meeting "I was told I would either settlement (sic), which is probably settle my claims for what I believed to be an unreasonable amount or the City had conducted a study and I would be fired for numerous violations of the policy." (Doc. 44 Ex. A Green Depo. at 52; *see also Id.* at 52-53 ("Q: Who told you that [you would be fired if you did not settle your claims]? A: Scott Collins. Q: Then you say, "if I settled my lawsuit the study would not be released"? A: Yes. Q: Correct? A: Yes. Q: And so Collins told you you would be fired, correct? A: Yes."); *Id.* at 212-13 ("I recall Scott Collins was doing most of the talking and they told me that Collins said that he offered a settlement somewhere around 43 thousand dollars. And he said the results of the study were negative, but if I were to drop my complaint and retire by the end of May, May 31st, that they would not release the results of the study to the media. He also said that if I did not retire then the city council would terminate my employment at the very next council meeting which was scheduled for June 4th.").)

A threat to terminate Plaintiff if he did not accede to Defendants' requests to (1) resign from his position and (2) dismiss *Green I* is not a materially adverse action under the circumstances. *Burlington* directs the Court to focus on whether

the complained of conduct "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. This standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69. Regardless of the label attached to the parties' May 29, 2012, meeting, it was clear that the parties had come together to try to resolve their ongoing disputes. An offer of forty-three thousand dollars to settle *Green I* is not materially adverse, nor is mentioning the negative results of the audit conducted by a neutral third party and stating that Plaintiff would be terminated unless he resigned. While Plaintiff argues that Collins threatened that Plaintiff would be terminated at the next City Council meeting unless he settled *Green I*, it is undisputed that Defendants took no action to terminate Plaintiff at the time of the meeting even though Plaintiff ultimately did not settle *Green I*. Obviously Plaintiff was not dissuaded from continuing his lawsuit by the statements during the meeting, and given the total lack of any adverse acts by Defendants, the Court is convinced that Collins' statements would not "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57.

Because Plaintiff has failed to identify a materially adverse action by Defendants, his claim for retaliation is due to be dismissed. Even assuming *in*

*arguendo* that Plaintiff suffered a materially adverse action, Plaintiff has nonetheless failed to show how such an adverse action was causally linked to his protected activity, nor has Plaintiff shown that Defendants' legitimate, non-discriminatory grounds for the actions were a pretext for retaliation.

### 3. CAUSAL LINK

As part of his *prima facie* case, a plaintiff must also establish that a causal connection exists between his statutorily protected activity and the alleged adverse employment actions he suffered. *Furcron*, 843 F.3d at 1310. To do so, the plaintiff must prove that but-for the employer's desire to retaliate, he would not have suffered the adverse employment action. *Booth*, 757 F.3d at 1207. Plaintiff cites *Goldsmith v. Bagby Elevator Company*, 513 F.3d 1261, 1278 (11th Cir. 2008) for the proposition that "the causal link element require[s] merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated." *University of Texas Southwestern Medical Center* made clear that but-for causation is the standard, not a "wholly unrelated" standard as stated in *Bagby Elevator*. 570 U.S. at 359-360. Following *University of Texas Southwestern Medical Center*, the Eleventh Circuit has reaffirmed its reliance on the "but-for" causation standard. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133 (2017); *Mealing v.*

*Georgia Dep't of Juvenile Justice*, 564 F. App'x 421, 427 n.9 (11th Cir. 2014) ("We conclude that the *McDonnell Douglas* framework continues to apply after the Supreme Court's *Nassar*, holding that a plaintiff must demonstrate "but-for" causation when making a Title VII retaliation claim.").

One way the plaintiff can establish a causal connection is if he can show sufficient evidence that the employer knew of his statutorily protected activity and that there was a close temporal proximity between this awareness and the adverse employment actions. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see Breeden,* 532 U.S. at 273 (holding that the temporal proximity must be "very close"). A claim of retaliation fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation." *Higdon*, 393 F.3d 1220. Alternatively, but-for causation must be proved by showing that the desire to retaliate was the "determinative influence" on the defendant's decision to take an adverse action. *Sims*, 704 F.3d at 1337.

Without other evidence of causation, a three-and-a-half month passage of time between the protected activity and adverse action is too long for the purposes of establishing the causal link. *See Clark*, 532 U.S at 273-74. The almost year-long gap in time between Plaintiff's protected activity and Defendants' alleged adverse

actions—and lack of other evidence that Defendants intended to retaliate against Plaintiff—prevents the Court from finding a causal connection in this action. Plaintiff filed his EEOC charges in May and June 2009[6] and filed *Green I* on June 29, 2011. [7] The acts of which Plaintiff complains occurred almost a year after Defendants became aware of Plaintiff's last protected act. Plaintiff was placed on administrative leave on February 20, 2012, and the statements made by Collins to Plaintiff during the settlement conference occurred on May 29, 2012. The temporal gap between the activities is thus too great to find a causal link, when there is no other evidence of causation.

While Plaintiff argues that the Court should consider the entire period of *Green I* for the purposes of its temporal proximity analysis, the Court identifies the date the decision-maker became aware of the protected activity, not when that protected activity ceased. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) ("We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and

---

[6] Collins became aware of the EEOC charges shortly after they were filed on May 29, 2009. (Doc. 46 Ex. B Collins Depo. at 141-42.)

[7] Collins was aware of *Green I* as late as July 8, 2011, according to the Notice of Service filed in *Green I. See* Doc. 3, *Green I*, 7:11-cv-2354-SLB (N.D. Ala. July 11, 2011).

the adverse employment action."). Given the passage of time and a lack of other evidence of causation, Plaintiff has not proved the required causal connection.

Plaintiff argues that because Collins mentioned the EEOC charges to members of the City Police Department during the audit, this comment shows that Collins' reason for the audit was to retaliate against Plaintiff. It is undisputed that Collins was answering a question posed by a member of the Department. (Doc. 46 Ex. B Collins Depo. at 261 ("Q: Do you think you brought [issues with Plaintiff] up or did somebody else bring it up? A: I believe I opened the floor for questions and someone had come and asked about why she was – she didn't get a one-day suspension and someone else did.").) Plaintiff additionally argues that "the recording of the meeting indicates Collins was attempting to taint the audit with negative statements made about [Plaintiff] in his absence," citing generally to a CD-recording of Collins' informal talk with the City Police Department, without pointing to any statements that actually support their allegation. (Doc. 53 ¶ 66.) Such a generalized statement is not sufficient to show but-for causation.

Nor does Plaintiff provide other "evidence of causation" to show a causal relationship between his filing of *Green I* and Defendants' later decision to either allow Plaintiff to resign or terminate his employment based on the results of the independent audit. Defendants have clearly shown good reason for the audit: both

concern over officer safety and evidence of dysfunction in Plaintiff's leadership of the City Police Department. Plaintiff states other disagreements with how the audit was conducted, such as its cost, the fact that the audit occurred months after Plaintiff first told Collins about officer safety issues, and that Defendants should have taken less serious disciplinary measures against Plaintiff. But these criticisms do not show a causal relationship, just that the audit could be conducted more cost-effectively, sooner, or resulting in less serious sanctions. Thus, because of the extended period of time between Defendants' awareness of Plaintiff's protected activity and the alleged adverse acts and absence of other evidence showing causation, the Court finds Plaintiff has failed to show a required causal link.

### ii. LEGITIMATE, NONDISCRIMINATORY REASON

If a Title VII plaintiff has made out a *prima facie* case for retaliation, which he has not, the burden of production then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for its actions. *Brown*, 597 F.3d at 1181 (quoting *Bryant*, 575 F.3d at 1308). Even if Plaintiff had met his burden, Defendants have articulated many legitimate and nondiscriminatory reasons for their decision to terminate Plaintiff if he did not voluntarily resign, and Plaintiff has not devoted a specific section of his Response to argue that the Defendants did not have a legitimate, nondiscriminatory reason to threaten to terminate Plaintiff. The

audit of the Police Department was approved by the City Council because of concerns about officer safety, including Plaintiff's e-mail to Collins that an officer was about to "go off the deep end" and might shoot up the Council chambers. Another reason for the audit relates to concerns voiced by Officer McCarley about another officer's sexual harassment complaint; these concerns went far beyond Plaintiff individually. Further, Collins's unrefuted testimony shows that other managerial issues influenced his decision to suggest the audit, such as supervisory issues, promotion practices, training, and favoritism. Therefore, the Court has no trouble concluding that Defendants have proffered legitimate, nondiscriminatory reasons for its decision to ask Plaintiff to retire or face termination.

### iii.  PRETEXT

If the analysis were to have gotten to this point, Plaintiff would be required to show that Defendants' proffered reasons for the adverse action were pretextual. In order to show pretext, the plaintiff must "demonstrate that [Defendants'] proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason [or retaliatory motive] more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289

(11th Cir. 2005); *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). A plaintiff survives summary adjudication if he produces sufficient evidence to allow a reasonable factfinder to disbelieve the employer's articulated reasons for its decisions. *Jackson*, 405 F.3d at 1289 ; *Howard v. BP Oil Co.,* 32 F.3d 520, 525-26 (11th Cir. 1994). The plaintiff must show sufficient "weaknesses or implausibilities" in the employer's articulated reasons. *Rioux v. City of Atlanta,* 520 F.3d 1269, 1278 (11th Cir. 2008).

Defendants have shown sufficient grounds for the audit of the police department; Plaintiff admitted that he sent the June 24, 2011 e-mail to Collins in which he mentioned an officer about to "go off the deep end" and who might "shoot[] up the council chambers." (Doc. 44 Ex. A Green Depo. at 106.) Plaintiff argues that the City of Northport had never conducted an audit of a department and thus its decision to "deviat[e] from its own standard procedures" shows pretext, basing his argument on *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). But *Hurlbert*'s deviation language relied solely on cases where the employer *violated* its own procedures, unlike in the present action where Defendants simply took a step that they had never previously done, but were within their power to do. *See Id.* In any case, that Defendants never before audited a department of the City does not show that they were seeking a pretext to fire

Plaintiff, rather that they were seeking to respond to extraordinary circumstances in the Police Department.

Likewise, simply questioning whether it was wise to spend such a large amount of money on the audit does not show that the audit was actually a pretext to retaliate against Plaintiff. Questions about the wisdom of the employer's decisions should not be reviewed by the courts. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions."). Regarding being placed on leave, Plaintiff admitted that the purpose of placing an employee on paid administrative leave is to enable the City to fairly investigate a matter and that this practice was legitimate protocol and "standard procedure." (Doc. 44 Ex. A Green Depo. at 139-40, 190.)

Defendants based their decision to terminate Plaintiff on the results of the audit, and Plaintiff has not offered any evidence that Defendants were instead motivated by a desire to retaliate against him. Plaintiff makes much of the fact that the audit was not yet finalized at the time of the conference. However, as shown by the audit itself, interviews of relevant persons in the Department and a questionnaire survey had already been conducted prior to the conference. (*See* Doc. 51 Ex. A Ex. 27 at 8.) That *Green I* was being litigated during the time the

settlement conference occurred is also immaterial; Defendants had known of Plaintiff's lawsuit for almost a year, and Plaintiff has offered nothing more than speculation that litigation activities in *Green I* motivated Defendants' actions. In conclusion, Plaintiff has failed both to make a *prima facie* case of discrimination and to show that Defendants' legitimate grounds for their actions were pretextual.

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (doc. 42) is due to be GRANTED. Defendants' Motion to Admit Evidence[8] (doc. 40), Motion for the Court to Take Judicial Notice[9] (doc. 41), Motion to Strike Exhibit K[10], and Plaintiff's Motion to Strike[11] (doc. 52) are due to be DENIED as MOOT. An Order consistent with this Opinion will be entered separately.

---

[8] Defendants moved to introduce evidence that a white department head, Michael Ramm, was placed on administrative leave subsequent to Plaintiff's own administrative leave. The information Defendants' Motion seeks to introduce is not material to the Court's decision, and thus the Motion to Admit Evidence is Denied as Moot.

[9] Defendants' Motion to Introduce Evidence seeks to introduce certain findings from *Green I*. Because the evidence Defendants seek to introduce would not change the results of this Opinion, the Motion is Denied as Moot.

[10] The Court has not relied on Plaintiff's Exhibit K nor considered it in the course of its decision, nor would that Exhibit if relied upon change the results of the Court's Opinion.

[11] Plaintiff's Motion to Strike objected to the use of Exhibit C to Defendants' Motion for Summary Judgment and facts concerning Kieth McKeown's placement on administrative leave. While Exhibit C includes an interview of Kelly McCarley by I.I., the information from Exhibit C is largely repeated by Collins during his deposition. The Court thus relies on Collins' deposition rather than the contents of Exhibit C. The facts concerning Kieth McKeown's placement on administrative leave were in no way necessary to the Court's Opinion, and the Court has not relied on that information in reaching its decision.

**DONE** AND **ORDERED** ON MARCH 9, 2018.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

190485